```
               UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


JAYWANT RAO,
     Plaintiff,
                                          CIVIL ACTION NO.
     v.                                   08-12027-MBB

UNITED STATES OF AMERICA,
     Defendant.
```

**MEMORANDUM AND ORDER RE:**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**
<u>**(DOCKET ENTRY # 14)**</u>

**September 9, 2010**

**BOWLER, U.S.M.J.**

Pending before this court is a motion to dismiss the complaint (Docket Entry # 14) filed by the United States of America ("United States").  The United States seeks to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), Fed. R. Civ. P. ("Rule 12(b)(1)").  (Docket Entry # 14).  After conducting a hearing on June 22, 2010, this court took the motion (Docket Entry # 14) under advisement.

<u>PROCEDURAL BACKGROUND</u>

Plaintiff Jaywant Rao ("plaintiff") brought this action against the United States on December 8, 2009, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346 ("FTCA").[1]  (Docket

---

[1] The complaint alleges negligence on the part of the Transportation Security Administration ("TSA"), an agency of the

Entry # 1).  On October 15, 2009, the United States filed a motion for summary judgment on the merits of the claim.  (Docket Entry # 11).  On March 24, 2010, the United States filed the motion to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.  (Docket Entry # 14).  This court initially addresses the motion to dismiss (Docket Entry # 14) as opposed to the motion for summary judgment (Docket Entry # 11) because jurisdiction is required in order to reach any ruling on the merits.  See Christopher v. Stanley-Bostitch, Inc., 240 F.3d 95, 100 (1st Cir. 2001) (when "federal court concludes that it lacks subject matter jurisdiction over a case, it is precluded from rendering any judgments on the merits of the case"); see also Mills v. Harmon Law Offices, P.C., 344 F.3d 42, 45 (1st Cir. 2003) (merits of claim are irrelevant when federal court lacks jurisdiction).

STANDARD OF REVIEW

"Rule 12(b)(1) is the proper vehicle for challenging a court's subject matter jurisdiction."  Valentin v. Hospital Bella

---

federal government.  Under the FTCA, the United States is the sole party that may be sued for injuries arising out of the alleged negligence of its agencies or officers.  See F.D.I.C. v. Meyer, 510 U.S. 471, 476 (1994); see also Vargas-Rodriguez v. Rios-Batistini, 2009 WL 3878256, *3 (D.P.R. Nov. 17, 2009) ("[i]t is now beyond dispute 'that the United States, and not the responsible agency or employee, is the proper party defendant in an [FTCA] suit'").  Thus, the United States is the appropriate defendant in this case.

2

Vista, 254 F.3d 358, 362-363 (1st Cir. 2001).  Because federal courts are courts of limited jurisdiction, federal jurisdiction is never presumed.  See Viqueira v. First Bank, 140 F.3d 12, 16 (1st Cir. 1998).  A Rule 12(b)(1) motion to dismiss based on sovereign immunity, as with a Rule 12(b)(6), Fed. R. Civ. P., motion, is construed liberally.  See Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995).  A court should treat all well pleaded facts as true and provide the plaintiff the benefit of all reasonable inferences.  Id.

When ruling on a Rule 12(b)(1) motion, "the court may consider whatever evidence has been submitted, such as depositions and exhibits submitted in this case."  Aversa v. United States, 99 F.3d 1200, 1210 (1st Cir. 1996).  Dismissal is only appropriate when the facts alleged in the complaint, taken as true, do not support a finding of federal subject matter jurisdiction.  Fothergill v. United States, 566 F.3d 248, 251 (1st Cir. 2009).

FACTUAL BACKGROUND

On July 12, 2007, plaintiff was passing through security at Terminal C at Boston's Logan International Airport ("Logan") in order to board a JetBlue flight to San Francisco, California. (Docket Entry # 1).  Plaintiff arrived at lane two of the security checkpoint and proceeded to pass through the checkpoint. (Docket Entry # 12, Ex. A ).  At the checkpoint, passengers may

3

place belongings in divesting bins.[2]  The bins travel through an X-ray machine and then onto a series of metal rollers that extend approximately six feet beyond the X-ray machine.  Passengers customarily retrieve their belongings from the bins.  (Docket Entry # 18, Ex. D).

On July 12, an unidentified departing female passenger placed her divesting bin on the floor at the end of lane two before leaving the checkpoint.  (Docket Entry # 12, Ex. A). Plaintiff collected his personal items and turned to leave lane two of the security checkpoint.  (Docket Entry # 12, Ex. A).  As plaintiff stepped away from the checkpoint he unintentionally placed his right foot into the divesting bin left on the floor by the unidentified female passenger.  (Docket Entry # 12, Ex. A). The divesting bin slid forward causing plaintiff to fall and fracture his ankle.  (Docket Entry # 12, Ex. A).

Angelo Bordonaro ("Bordonaro"), a Transportation Security Manager at Logan, was on duty at the time of the incident. According to Bordonaro, the primary function of TSA's screening personnel at these checkpoints "is to ensure the safety and security of the traveling public."  (Docket Entry # 18, Ex. D). "Screening personnel must be vigilant" in order "to detect potential threats" including weapons, according to Bordonaro.

---

[2] Divesting bins are gray containers in which passengers place personal items for X-ray on the conveyor belts located at the security checkpoints.

(Docket Entry # 18, Ex. D).  TSA screening personnel return the divesting bins used by passengers to the front of the checkpoint in order to ensure that the screening process operates efficiently.  (Docket Entry # 18, Ex. D).

According to a Transportation Security Officer for TSA at Logan ("TSA officer"), there is usually a bag checker assigned the job of collecting the bins as passengers retrieve their belongings.  The bag checker's responsibility consists of stacking the bins and bringing them back to the front of the checkpoint for re-use, according to the TSA officer.  (Docket Entry # 18, Ex. B).  She also considered the collection of the bins and the return of them to the front of the checkpoint a mandatory part of the job if she was the person assigned to this "baggage area."  (Docket Entry # 18, Ex. B).  Likewise, another Transportation Security Officer agreed that it was the job of the individual working in this back area to collect the bins as passengers retrieve their belongings.  The typical process at the time entailed the bag checker stacking the bins on top of the X-ray machine and another TSA employee moving them to the front for passenger access when the bins reached a certain height.  (Docket Entry # 18, Ex. C).

The complaint alleges that negligence on the part of the Transportation Security Administration ("TSA") caused plaintiff to suffer injuries at Logan.  (Docket Entry # 1).  Plaintiff purportedly sustained bodily injuries and requests damages, as

opposed to declaratory or injunctive relief, in the amount of $175,000.  (Docket Entry # 1).

## DISCUSSION

In seeking to dismiss this action due to the lack of subject matter jurisdiction, the United States argues that the discretionary function exception of the FTCA bars the negligence claim against the Government.  Specifically, the United States contends that the "very theories that Plaintiff advances in order to assign liability for his injury to TSA necessarily implicate TSA's decisions regarding the staffing, design and equipping of its security checkpoints."  (Docket Entry # 15).  Discretionary conduct of this nature, according to the United States, therefore falls under the discretionary function exception of the FTCA. (Docket Entry # 15).

The FTCA provides a limited waiver of the United States' sovereign immunity.  See Limone v. United States, 579 F.3d 79, 88 (1st Cir. 2009).  The relevant provision declares that, "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 2674; see United States v. Varig Airlines, 467 U.S. 797, 808 (1984).

The liability of the United States under the FTCA, however, is subject to certain exceptions contained in 28 U.S.C. § 2680(a)

("section 2680(a)"), including the discretionary function exception.  This exception states that the United States is not liable for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).[3]

The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals."  United States v. Varig Airlines, 467 U.S. at 808.  "Only if the conduct is both discretionary and policy-driven will section 2680(a) strip the court of subject matter jurisdiction."  See Bolduc v. United States, 402 F.3d 50, 60 (1st Cir. 2005).

The discretionary function exception's application to claims against the United States is guided by an established analytical framework.  In determining whether the discretionary function exception applies, the court must:  (1) identify the government conduct giving rise to the claim in question; (2) determine whether that conduct itself is discretionary; and if so, (3)

---

[3] An employee of the Government includes "officers or employees of any federal agency."  28 U.S.C. § 2671.

decide whether the exercise of that discretion is susceptible to "policy related judgments." Berkovitz v. United States, 486 U.S. 531, 536 (1988); Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir. 2003); Shansky v. United States, 164 F.3d 688, 691-692 (1st Cir. 1999).

A.  Nature of the Conduct Giving Rise to the Claim

The first step in determining whether the discretionary function exception applies is to identify the conduct underlying plaintiff's claim. See Muniz-Rivera v. United States, 326 F.3d at 15. Plaintiff asserts that TSA, its agents, servants and employees were negligent by failing to:

> (1) provide an appropriate repository for passengers to use after passing through security and collecting their belongings, and/or (2) have an employee available to take the bins from passengers after they've passed through security, and/or (3) remove the plastic bin from the floor after it was placed there by a passenger.

(Docket Entry # 1). These allegations focus upon TSA's failure to promptly collect the divesting bins at the security checkpoint where plaintiff suffered his injury.

Application of the discretionary function exception hinges upon whether the conduct in question is "of the nature and quality that Congress, in crafting the discretionary function exception, sought to shelter from tort liability." Shansky v. United States, 164 F.3d at 691. Thus, this court must consider the second and third part of the discretionary function analysis: whether the handling of divesting bins at security checkpoints is

discretionary conduct and, if so, whether this discretion of TSA in the handling of divesting bins is susceptible to policy related judgments.  See Shansky v. United States, 164 F.3d at 691.

B.  Discretionary Activity

Plaintiff submits that the conduct at issue of having an employee available to take the bins from passengers after they passed through security and/or failing to remove the plastic bin from the floor after a passenger placed it there was not discretionary.  Rather, it was subject to a mandatory policy as evidenced by the aforementioned testimony of Bordonaro and the two transportation security officers.

Conduct is not discretionary under the FTCA when "a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'"  United States v. Gaubert, 499 U.S. 315, 322 (1991); accord Irving v. United States, 162 F.3d 154, 163 (1st Cir. 1998) (quoting Gaubert, 499 U.S. at 322).  Thus, "if a regulation mandates particular conduct" and "the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy."  Id. at 324.  On the other hand, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation

of the regulations." Id.

By statute, the Under Secretary of the TSA ("the Under Secretary")[4] is responsible for "security screening operations for passenger air transportation . . . under sections 44901 and 44935" and shall "develop standards for the hiring and retention of security screening personnel." 49 U.S.C. § 114(e). The Under Secretary is also responsible for "asses[sing] threats to transportation" and for "devlop[ing] policies, strategies, and plans for dealing with threats to transportation security." 49 U.S.C. § 114(f). More notably, the statute mandates that the Under Secretary "oversee the implementation and ensure the adequacy of security measures at airports." 49 U.S.C. § 114(f)(11). Oversight necessarily embodies a measure of discretion in the implementation of security at such airports. See generally Irving v. United States, 162 F.3d at 162-163. The same statute also requires the Under Secretary to "inspect, maintain, and test security facilities, equipment and systems." 49 U.S.C. § 114(f)(9).

As noted above, 49 U.S.C. § 114 cross references 49 U.S.C. § 44901 and 44935 (respectively "section 44901" and "section 44935"). Section 44901 dictates that the Under Secretary "shall

---

[4] After "the passage of the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat. 2135, the title of the head of the TSA was changed from 'Under Secretary,' as the post is referred to in the [Aviation and Transportation Security Act], see 49 U.S.C. § 114(b)(1), to 'Administrator.'" Conyers v. Rossides, 558 F.3d 137, 139 n.1 (2nd Cir. 2009).

provide for screening of all passengers and property" including "carry-on . . . baggage." 49 U.S.C. § 44901(a). Section 44935 additionally requires the Under Secretary to prescribe inter alia standards for "minimum staffing levels" of airport personnel. 49 U.S.C. § 44935(a)(3).

The statute also leaves it to the Under Secretary to determine the number of individuals "necessary to carry out the screening functions of the Under Secretary under section 44901." The relevant provision reads:

> Screener Personnel . . . Notwithstanding any other provision of law, the Under Secretary of Transportation for Security may employ, appoint, discipline, terminate, and fix the compensation, terms, and conditions of employment of Federal service for such a number of individuals as the Under Secretary determines to be necessary to carry out the screening functions of the Under Secretary under section 44901.

49 U.S.C. § 44935 (note); see Conyers v. Rossides, 558 F.3d at 140 (quoting 49 U.S.C. § 44935 (note)). Such language confers discretion upon the Under Secretary to determine the number of TSA officers necessary to carry out screening at airport security checkpoints.

Section 114 of Title 49 of the United States Code authorizes the Under Secretary to issue "regulations as are necessary to carry out the functions of the [TSA]." 49 U.S.C. § 114(l)(1). The relevant regulations do not alter this discretionary scheme with respect to the number of screeners at checkpoints and the use of equipment beyond an X-ray machine. See 49 C.F.R. §§

11

1544.201 et seq.  At locations at which the TSA conducts the screening of individuals and their accessible property prior to aircraft boarding, see 49 C.F.R. § 1544.207(b), the regulations prescribe certain radiation requirements for X-ray systems and exceptions for photographic equipment.[5]  49 C.F.R. § 1544.211; see 21 C.F.R. § 1020.40 (requiring "operator presence at the control area" of an X-ray system, including one for carry-on baggage, "in a position which permits surveillance of the ports and doors during generation of x-radiation").  The regulations, however, are silent with respect to the use of divesting bins or any other kind of repository equipment for a passenger's accessible property.

In sum, the foregoing statutes and regulations endow TSA with the discretion to determine the number of screeners above and beyond an "operator presence" at the ports and doors of an X-ray system for carry-on baggage.  The statutes and regulations are completely silent with respect to the use of divesting bins or any other kind of repository equipment for passengers to collect their belongings or "accessible property" after their property passes through the X-ray system.  The silence, coupled with the focus upon the X-ray systems rather than any other equipment, affords TSA considerable if not unbridled leeway to

---

[5]  It is also worth noting that the regulations impose the obligations upon the "airport operator" as opposed to TSA.  See 49 C.F.R. §§ 1544.201(b) & 1544.211; 21 C.F.R. § 1020.40.

determine the manner in which passengers will collect their carry-on property after it passes through security. See 21 C.F.R. § 1020.40; 49 C.F.R. § 1544.211; 49 U.S.C. § 44935(a)(3); 49 U.S.C. § 44935 (note); see also Irving v. United States, 162 F.3d at 163 ("[o]f particular importance, the regulations do not prescribe any specific regimen governing the scope or detail of general administrative inspections performed by compliance officers") (collecting cases). Such leeway establishes the discretionary nature of the conduct at issue. See, e.g., Irving v. United States, 162 F.3d at 164 ("[g]iven the considerable leeway afforded to compliance officers under the statutory and regulatory mosaic, general administrative inspections conducted by OSHA compliance officers would seem to fit comfortably within the discretionary function exception").

In light of the statutory and regulatory framework that gives broad leeway to the Under Secretary in this area of airport security, the statements by the TSA officers and Bordonaro do not set out or create "*established* governmental policy," Irving v. United States, 162 F.3d at 165-166,[6] with respect to the conduct

---

[6] The court in Irving discusses at length the circumstances under which sources other than statutes, regulations and agency guidelines may delineate established government policy. The relevant statute gives the Under Secretary the authority to determine the number of screening individuals necessary to carry out the TSA's screening functions. 49 U.S.C. § 449035 (note). Regulations concern the X-Ray system used for carry-on baggage but do not explicitly cover the equipment used to contain the accessible property as it passes through the machines. There is no need to resort to the statements of the two TSA officers or

at issue.  The same is more than likely true with respect to the description of TSA policies by Dale Mason ("Mason"), a program analyst with TSA's Office of Security Operations ("OSO").[7]  In any event, Mason's averments comport with the statutory and regulatory framework and the discretion accorded TSA as to staffing and repository equipment at security checkpoints.

    Consistent with the statute and foregoing regulations, Mason avers that there is no regulation or policy that mandates minimum staffing requirements for handling or monitoring divesting bins at airport security checkpoints.  Pre-flight screening of airline passengers is one of the primary functions of the OSO.  As an OSO program analyst, Mason coordinates and provides advice regarding the design and configuration of airport security checkpoints as a member of the Operations Improvement Branch of OSO's Operations

---

the Transportation Security Manager at Logan (Bordonaro) to ascertain established policy and determine if the conduct at issue is discretionary.  See Irving v. United States, 162 F.3d at 164-166.  Such sources do not shed light or otherwise alter the statutory and regulatory framework that gives TSA the discretion to determine staffing levels at security checkpoints and repository equipment.  Furthermore, these individuals are not official policy makers.  See Id. ("[t]o determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions").  Bordonaro's responsibility involves "making sure that TSA policies regarding the screening of passengers are properly applied" as opposed to formulating such policies in the first instance.

[7] Accordingly, this court does not rely on Mason's testimony.  In the alternative and if this court considered the averments other than those regarding budgetary and resource allocation (Docket Entry # 15, Ex. 1, ¶¶ 17 & 20), the decision to allow the motion to dismiss would not change.

Improvement Division.  (Docket Entry # 15, Ex. 1).

Mason further attests that TSA does not have a mandatory guideline for configuring a security checkpoint.  The agency does, however, have a design guide that depicts templates for the layout of a checkpoint.  Because of differences in airport terminal buildings, however, there is no single design or mandatory guideline depicting a required design or layout. (Docket Entry # 15, Ex. 1).

According to Mason, OSO issues and revises a manual captioned Standard Operating Procedures ("SOP") which sets out a uniform policy.  The SOP sets a minimum level of personnel and equipment for a checkpoint, according to Mason.  The minimum is at least one X-ray machine and operator and one walk through metal detector and operator, as also stated by Mason.  (Docket Entry # 15, Ex. 1).  Beyond these minimums that derive from informal agency rules, Mason is not aware of any requirement to assign a TSA officer or screener to supervise the handling of divesting bins.[8]

The relevant statutes and regulations, which include 49 U.S.C. § 44935 (note), endow the Under Secretary with discretion

---

[8] With respect to law enforcement personnel, section 44901 requires "at least 1 law enforcement officer at each airport security screening location."  49 U.S.C. § 44901(g).  Beyond this number and for airports such as Logan, "the Under Secretary shall order the deployment of additional law enforcement personnel at airport security screening locations if the Under Secretary determines that the additional deployment is necessary to ensure passenger safety and national security."  49 U.S.C. § 44901(g).

to determine the number of TSA employees necessary to carry out airport screening. At best, the SOP provides a guide that establishes one X-ray machine but, similar to the regulations, 21 C.F.R. § 1020.40 and 49 C.F.R. § 1544.211, leaves it to the discretion of local TSA officials at an airport to decide how to employ other equipment at security checkpoints. (Docket Entry # 15, Ex. 1).

Decisions regarding airport security are oftentimes matters of discretion that do not provide a basis for an FTCA claim. See Singh v. South Asian Society of the George Washington University, 2007 WL 1521050, *4 (D.D.C. May 21, 2007); Attallah v. United States, 758 F.Supp. 81, 91 (D.P.R. 1991) ("nature and extent of personnel supervision and airport security are discretionary determinations for which the sovereign immunity of the United States has not been waived"). This case is no exception. The conduct at issue is discretionary.

C.  Susceptibility to Policy Related Judgments

Having deemed the management of divesting bins at security checkpoints discretionary, this court turns to the final step of the analysis: determining whether the discretion bestowed upon TSA regarding the handling of divesting bins is susceptible to policy related judgments. See United States v. Gaubert, 499 U.S. at 325. This requires a court to consider "whether this discretion is of the type and kind that Congress sought to safeguard through the discretionary function exception."

Fothergill v. United States, 566 F.3d at 253.  The government is not required to "demonstrate that a policy judgment was made in order to fulfill this prong; rather the court must only find that 'acts and omissions . . . are susceptible to policy analysis.'" Sanchez v. United States, 2010 WL 1626118 at *8.  Here, plaintiff must overcome the presumption that when "established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  United States v. Gaubert, 499 U.S. at 324; accord Irving v. United States, 162 F.3d at 168.

Plaintiff contends that the handling of divesting bins at security checkpoints does not constitute conduct grounded in TSA policy considerations.  (Docket Entry # 18).  The argument, however, fails to consider the budgetary concerns and resource allocations necessarily implicated in designing an airport security checkpoint.  Mason attests to the finite resources of TSA as well as the variability of airport passenger traffic depending upon the size of an airport and the footprint of a security checkpoint.  (Docket Entry # 15, Ex. 1, ¶¶ 17 & 20).  Insofar as plaintiff complains of a failure of TSA to allocate personnel for collection of divesting bins or provide a composure table[9] for placement of the bins or other form of repository

---

[9] A composure table refers to counter space at the end of an airport security checkpoint.

17

equipment, the conduct directly relates to the agency's budgetary and resource decisions. See Limar Shipping Ltd. v. United States, 324 F.3d 1, 10 (1st Cir. 2003) ("[a]llocation of resources and budget management involve prioritizing and are quintessentially policy based choices"). The discretionary function exception is aimed at protecting government agency decision making of this nature from tort liability. See United States v. Varig Airlines, 467 U.S. at 820 (discretionary function exception designed to prevent courts from second guessing "political, social, and economic judgments of an agency exercising its regulatory function"); see also Weissich v. United States, 4 F.3d 810, 813 (9th Cir. 1993) (personnel allocation and budgetary decisions fall within discretionary function exception).

    The number of TSA personnel to use at security checkpoints and the type of equipment employed to transport a passenger's accessible property through an X-ray system are susceptible to policy analysis. See generally Shansky v. United States, 164 F.3d at 692 (in light of presumption, "Shansky cannot prevail . . . unless she demonstrates that the decision to forgo handrails and warning signs was not susceptible to policy analysis"). The fact that the conduct at issue involves the area behind the X-ray system and the handling of the divesting bins by TSA employees does not sufficiently remove it from susceptibility to policy related judgments concerning the safety and security of passenger

airport transportation.

It is not this court's role to second guess the layout of TSA security checkpoints, nor is it within the purview of this court to determine the appropriate personnel allocation throughout a security checkpoint area. Agency operations within the realm of a discretionary function require a "balancing of many technical and even social considerations, including specifically the trade-off between greater safety and greater . . . effectiveness." Boyle v. United Technologies Corp., 487 U.S. 500, 511 (1988).

The negligence claim invites a reexamination of TSA policies that fall within the realm of government activity that the FTCA shields from liability. The conduct at issue is discretionary and susceptible to the policy related judgments of TSA regarding how it structures and staffs security checkpoints. Thus, section 2680(a) of the FTCA bars plaintiff's claim and dismissal of the complaint is therefore appropriate under Rule 12(b)(1) for lack of subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons, the motion to dismiss (Docket Entry # 14) is **ALLOWED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge